Filed 5/20/26  In re J.G. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re J.G., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, | G065803 |
| Plaintiff and Respondent, | (Super. Ct. No. DP019473-003) |
| v. | O P I N I O N |
| C.M., | |
| Defendant and Appellant. | |

Appeal from an order of the Superior Court of Orange County, Julie Anne Swain, Judge. Affirmed.

Rich Pfeiffer for Defendant and Appellant.

Leon J. Page, County Counsel, Debbie Torrez and Deborah B. Morse, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minor.

C.M. appeals from the juvenile court's restraining order prohibiting him from, inter alia, contacting J.G. (the child) and possessing firearms.[1] He argues insufficient evidence supports the restraining order and the order is unconstitutional. We disagree and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

I.

APRIL 2023 REQUEST FOR RESTRAINING ORDER

*A. Request for Restraining Order*

C.M. was a former foster parent and described himself as a mentor of the child. From July 2020 to May 2021, the child was placed with C.M. In May 2021, the child was removed from C.M.'s home at C.M.'s request.

In September 2022, C.M. changed his mind and requested the Orange County Social Services Agency (Agency) place the child with him. C.M. stated he would be willing to adopt the child, even though the child had been placed in a potential adoptive home for 13 months. The child was not placed with C.M.

On January 10, 2023, the child's court-appointed special advocate reported concerns regarding C.M. "interfering with planned outings and undermining the foster parent's authority." C.M. gave the child a cell phone and questioned the foster parent for withholding the cell phone when the child exhibited "poor behavior." C.M. told the foster parent to return the cell phone to the child so C.M. and the child could communicate.

---

[1] This is a fast track child welfare case. The briefs were filed later than usual due to the striking of C.M.'s initial opening brief and appellate record. Consequently, since this case does not involve custody or placement issues, we find good cause to file this opinion more than 250 days after the filing of the notice of appeal. (Cal. Rules of Court, rule 8.416(e)(1).)

On January 13, 2023, the child absconded from his placement, and C.M. picked up the child at the child's request.

On January 17, 2023, the child met with a social worker and the foster parent. The social worker instructed the child to return to the foster parent's home. The child refused. After school that day, C.M. picked up the child.

The next day, child abuse reports were filed alleging C.M. "inappropriately harbor[ed]/shelter[ed]" the child and another youth, K.G., who was also placed with C.M. in the past. Both had absconded from their prospective adoptive placements and had been staying with C.M.

On January 19, 2023, a child abuse report was filed alleging C.M. sexually abused a youth. On the same day, the Agency picked up the child at school and transported him to the Orangewood Children and Family Center.

On January 25, 2023, the juvenile court issued a no-contact order prohibiting C.M. from having contact with the child. It also ordered the child to relinquish his cell phone, smartwatch, and earbuds—all purchased by C.M. for the child—to the Agency. The next day, the child refused to give his cell phone to the Agency. The Agency believed, based on reports, C.M. had installed tracking software on the cell phone and could facilitate unauthorized communication with the child.

In February 2023, a youth reported seeing the child and three other youths leave in a vehicle from Orangewood. Law enforcement found the child and the other youths at C.M.'s home. C.M. said he did not notify the Agency regarding the child and other youths, and it appeared the child and other youths had new clothes and backpacks. Law enforcement transported the child and youths to Orangewood.

Roughly a week later, law enforcement found the child and three other youths on C.M.'s boat at a marina without C.M. and without C.M.'s permission. When law enforcement contacted C.M., C.M. offered to return the child and other youths to the Agency, despite, according to the Agency, his awareness of the no-contact order between him and the child. Law enforcement transported them to Orangewood, but they immediately left and walked toward a nearby shopping center.

In early March 2023, days after the child and another youth went missing from Orangewood, Agency staff drove to C.M.'s home and observed the child and the other youth walk into C.M.'s home. The Agency requested law enforcement to conduct a welfare check at C.M.'s home. Law enforcement visited C.M. but he denied the child and the other youth had been at his home.

In late March 2023, two social workers attempted to conduct a compliance visit with the child at C.M.'s two adjacent houses. They requested law enforcement's assistance, as they knew C.M. had numerous firearms. While waiting for law enforcement, the social workers observed the child retrieving a package from the front door of one house and retreating inside through a garage or a side gate to the other house. A neighbor reported "'many teens live at the two houses'" and the two houses "'are somehow related with each other.'" Upon seeing pictures of the child, the neighbor confirmed seeing the child "regularly and recently" and observing the child living there. As no one answered the door at either house, the social workers concluded their visit and left.

In April 2023, the Agency requested a restraining order protecting the child from C.M. The Agency asserted C.M. violated "guidelines and directives for ensuring the physical and emotional safety of" the child

and other youths, subjected the child to "high-risk activities without" the Agency's authorization, disrupted the stability of the child's prospective adoptive placement, undermined efforts to find the child and to provide a placement for the child, and harbored the child in C.M.'s home despite the juvenile court's order prohibiting C.M. from contacting the child. According to the Agency, C.M. "had a profound negative impact on" the child, evidenced by the child's increasingly troublesome behavior, including running away, refusal of alternative placement options, truancy, disrespectful or defiant behavior, and delinquent behavior. C.M.'s "scheming, subversive, self-serving, and contemptuous behavior" disrupted Orangewood's care of several youths, as the Agency believed C.M. provided funds to the child and other youths to abscond from Orangewood. C.M.'s actions led the child to focus solely on C.M. and swayed the child "to reject the prospective adoptive parents to whom, until [C.M.] reentered the dynamic, he had been attached and by whom he wanted to be adopted." The child had been missing since March 3, 2023.

The juvenile court issued a temporary restraining order protecting the child from C.M. in April 2023. The court issued an order that C.M. not abuse, have no contact with, and stay away from the child. The court also ordered C.M. to surrender his firearms, firearm parts, and ammunition. Thereafter, the court extended the temporary restraining order and continued the order to show cause hearing regarding the restraining order several times.

B. Hearing

At the order to show cause hearing in early 2024, C.M. testified as follows. Before the child was placed with C.M., C.M. entered into a safety plan with the Agency in early 2020 regarding his care of an eight-year-old

5

youth. C.M. had taken this eight-year-old youth to a shooting range after receiving permission from this youth's aunt, allowed this youth "to pretend to steer the steering wheel [of a vehicle] in the parking lot," and flew with this youth on his airplane. According to the safety plan, if C.M. were to take a youth on his airplane or to the shooting range, he would be required to obtain permission from a social worker. C.M. testified, while providing respite care for this eight-year-old youth, this youth came into C.M.'s bedroom one night, saying he was scared. C.M. let this youth lie down in C.M.'s bed. At no point did C.M. and this eight-year-old youth share the bed.

As to the child, C.M. testified the child was placed with C.M. for a year during the COVID-19 pandemic. C.M. had known the child for five years and had been the child's mentor. The child, despite having his own room, wanted to lie on the floor in C.M.'s bedroom; the child was scared and had nocturnal issues. That prompted C.M. to put a rollaway bed in C.M.'s bedroom, and they slept in the same bedroom for six or seven months. As the COVID-19 pandemic wore on, C.M. sought to remove the child from his care, as he wanted the child to be in a placement where the child could interact with other children and where C.M. could continue to visit the child as an "uncle" occasionally. The child's removal from C.M.'s care was "the biggest mistake" C.M. made in his life.

C.M. testified he maintained his contact with the child "because we had some issues with the foster parents." Beginning in September 2022, C.M. began to visit the child every two weeks. In late 2022, the child told C.M. he did not want to stay with the foster parents or be adopted by them. In December 2022, the child complained to C.M. that his foster mother was confiscating his cell phone, which C.M. had provided him, purportedly as a

6

form of punishment. C.M. encouraged the child to voice his concerns regarding losing his cell phone privileges.

In mid-January 2023, the child called C.M. to pick him up from his placement. When C.M. picked up the child, the child told C.M. his foster mother and a social worker had agreed to confiscate his cell phone and to limit his visits with C.M. to possibly once a month. C.M. spoke with the child's foster mother that day, and she allowed C.M. to watch the child over the weekend. At the end of the weekend, the child refused to return to his placement. C.M. notified the child's foster mother and a social worker regarding the child's refusal. The next day, C.M. took the child to school and picked him up afterward. The Agency told C.M. that C.M. was interfering with the child's placement and instructed C.M. to return the child to his placement. C.M. made no attempt to take the child to his placement because the child was "adamant that he wasn't going to go" and C.M. "wasn't going to force him." C.M. continued to take the child to school for a couple of days. After a meeting with the Agency, which again instructed C.M. to send the child back to his placement, the Agency picked up the child at school.

Thereafter, C.M. stopped visiting the child. The last time C.M. and the child met was approximately February 2023, when the child and K.G. showed up at C.M.'s home a few times. On one occasion, the child and K.G. appeared "wet, hungry, [and] dirty" at C.M.'s home, so C.M. let them shower and eat. But C.M. "told them [he] need[ed] to take them back to Orangewood"; less than an hour later, law enforcement arrived at C.M.'s home and picked them up.

C.M. testified he was unaware of the juvenile court's January 25, 2023, no-contact order prohibiting C.M.'s contact with the child. C.M.

testified his attorney informed him on February 21, 2023, about the juvenile court's reiteration of a no-contact order the same date.

In April 2023, the child and K.G. showed up again at C.M.'s home. C.M. directed his friend to answer the door and to tell the child to leave. While C.M. had no face-to-face contact with the child, the child still sent cell phone messages and video messages to C.M. C.M. denied making any efforts to communicate with the child indirectly through anyone.

C.M. testified the Agency revoked his resource family approval certificate after the April 2023 temporary restraining order. When the resource family approval program certified him, he was able to have two children in his home, and later three, with no age restrictions. In July 2022, the resource family approval program imposed age restrictions, allowing C.M. to have children only 10 years old and older. According to C.M.. the resource family approval program's stated reason for the restriction was C.M. "was like Michael Jackson" and "grooming" the eight-year-old youth who was previously under C.M.'s care.

C.M. testified he had a wireless provider's parental care application that allowed monitoring of the child's cell phone activity and tracking of the child's location. C.M. denied monitoring the child's cell phone after the child left his care. He also denied installing tracking software on gaming devices and laptops held by youths in his care. C.M. denied he provided the child with any money since the April 2023 temporary restraining order.

C.M. testified he was seeking to have the child placed with him because the child wanted the placement and the child's former placement was not going well. C.M. believed the Agency was treating him unfairly and the

8

April 2023 temporary restraining order lacked a factual basis. He was unaware of the child's whereabouts at that time of the hearing.

*C. Ruling*

In March 2024, the juvenile court found the Agency did not meet its burden on its request for the restraining order. During off-the-record conversations, the Agency had agreed to stop its presentation of evidence and, as a result, the court found the Agency abandoned its prosecution of its request for the restraining order. The court adopted the Agency and C.M.'s agreed-upon proposed protective orders and treated them as an agreement between the parties. The protective orders were: (1) "A no[-]contact order between [C.M.] and the youth on each of the three matters currently pending [order to show cause] hearings" involving three youths, including the child; (2) C.M. "will withdraw his request with prejudice for placement of" the child; (3) C.M. "will not seek placement of any youth in California"; (4) C.M. "will not allow the dependent youth into any of his properties in California, Texas or any other state where [C.M.] may hold property. Property includes residences as well as yachts/boats, planes and the like"; (5) C.M. "is to immediately notify [the Agency] within 24 hours if any of the dependent youth attempt to enter his properties"; and (6) C.M. "will not challenge the suspension/revocation of his foster care license."

## II.

### JUNE 2024 REQUEST FOR RESTRAINING ORDER

*A. Request for Restraining Order*

In early April 2024, Z.P. contacted a social worker, inquiring if she could visit the child at Orangewood. The social worker asked how Z.P. knew the child. Z.P. replied she knew the child from his placement with C.M. and she maintained a relationship with the child thereafter. The social

9

worker asked the child how he knew Z.P. and her spouse C.P. The child said he knew them through C.M., as C.M. and C.P. were friends. The social worker informed Z.P. the Agency deemed visitation inappropriate. The social worker asked four other social workers and the child's former caregiver whether they had any contact with Z.P. or C.P.; not one had any contact with them or recalled contacting or knowing them.

In mid-April 2024, the child was placed at a short-term residential treatment program. This placement reported the child received a phone call, and the Agency learned the number belonged to C.M. after a social worker conducted "a reverse phone look up" on the phone number. Throughout April and May 2024, the child left this placement without permission. On one occasion, the child returned with a new cell phone and money.

In late May 2024, C.P. and Z.P. filed a Welfare and Institutions Code section 388 petition in the juvenile court, requesting the court place the child with them.[2] They requested placing the child at an address in Texas. A social worker conducted research online and discovered C.M. owned the property with the address and two other properties nearby the address. The Agency became concerned the child may be a victim of sexual exploitation.

In early June 2024, two social workers met with the child and asked about the child's plans. The child said he wanted to live with C.M. One social worker asked the child whether he would want to live with anyone else if he could not live with C.M. The child replied, "[N]o." The other social worker asked the child "who were important people the [child had]

_____

[2] All undesignated statutory references are to the Welfare and Institutions Code.

10

maintained contact with." The child mentioned a few individuals but not C.P. or Z.P.

In a June 2024 interim review report, the Agency recommended the juvenile court deny Z.P. and C.P.'s section 388 petition. After a hearing on the matter, the juvenile court denied it.

In late June 2024, the Agency requested a restraining order protecting the child from C.M. The Agency asserted C.M. violated the juvenile court's March 2024 no-contact order, citing the child's phone call with a number belonging to C.M. and the out-of-state placement request involving a home owned by C.M. The court denied the request for a temporary restraining order but set a hearing date to consider the request for a restraining order.

Throughout June, July, August, September, October, and November 2024, the child frequently left his placement without permission, used ride-hailing services, and ordered food delivery despite directives against it for safety reasons. In one instance, the child left his placement to get his cell phone repaired. Additionally, the Agency received reports the child paid for some items at a store with his cell phone, the child used a video streaming account associated with C.M.'s e-mail address, and the child was receiving $600 per week from a previous "rich" caregiver.

B. *Hearing*

In November 2024, the juvenile court held a hearing on the June 2024 restraining order request. C.M. testified as follows. He denied having any contact with the child. The child sent approximately 20 to 40 text messages to C.M. and called him 25 to 30 times since March 2024, but C.M. did not respond to the text messages or phone calls. C.M. did not notify the Agency regarding the child's text messages or voicemails. C.M. allowed

several people to use his video streaming account, including his own children, the child, and K.G.; C.M. had granted the child access to the account years ago when the child lived with him. C.M. acknowledged the child had been on C.M.'s cell phone plan since 2018 but denied providing the child with a cell phone. C.M. denied funding the child's ride-hailing and food delivery service accounts, being able to track the child through the child's cell phone, and giving money or gifts to the child.

Additionally, C.M. testified he had known C.P. for years. C.P. stayed with C.M. every weekend since C.P was 13 years old, and C.M. considered C.P. and Z.P.'s children as C.M.'s grandchildren. C.M. complained to C.P. and Z.P. regarding his experience with the Agency. C.P. and Z.P. "were disgusted and decided that they wanted to file for" placement of the child as they had known the child as long as C.M. had.

After oral arguments by the parties, the juvenile court denied the request for a restraining order, explaining the Agency did not meet its burden of proof. The court ordered the Agency to remove the child's cell phone from his possession. It ordered the March 2024 protective orders to remain. It also encouraged terminating the child's access to C.M.'s cell phone account and video streaming account.

III.

FEBRUARY 2025 REQUEST FOR RESTRAINING ORDER

A. Request for Restraining Order

In November 2024, C.M. sent a letter to the Orange County Board of Supervisors (Board), describing his experience with the child and the Agency and requesting the child and K.G. be placed in C.M.'s home.

In December 2024, a video was posted online entitled, "'Tell [the Agency] to Listen to [the Child and K.G.],'" showing the faces of the child and

12

K.G. with a voiceover by C.M. According to the Agency, in the video, C.M. introduced the child and K.G. by first name, stated they were in foster care, said he wanted to adopt both of them and they wanted C.M. to adopt them, and asked "viewers to 'tell [the Agency] to listen to what the boys want[ed].'" The video contained an image of the child and K.G. talking to C.M. via a video call. Staff at the child's court-supervised placement reported some of the images in the video featured the placement in the background. The video was later removed at the Agency's request.

In early January 2025, two videos were posted online, featuring the child, K.G., and their voices. Later that month, C.M.'s publicist, T.D., e-mailed the Board, stating C.M. wanted to adopt the child and K.G. T.D. also mentioned C.M. had been sharing his story publicly, including on a social media page, and C.M. had "taken out a billboard to engage the public." The Agency thereafter discovered the social media page on which C.M. expressed his intent to adopt the child and K.G.

In mid-January 2025, the Agency received a child abuse report that the child was taking photographs of himself and sending them to C.M. in exchange for money. On January 23, 2025, in an interview with a social worker, the child denied sending nude videos or photographs to C.M. in exchange for money. The child said he goes to a computer gaming cafe when he and K.G. abscond from their placement. The child stated his placement drives him there or he uses a ride-hailing service. When asked how he paid for the ride-hailing service, the child was hesitant to answer. He reported he uses his allowance money to purchase gift cards and loads the gift card amount to his cell phone account. On the same day, in an interview with a social worker, K.G. said he introduced the child to C.M. years ago. K.G. disclosed he had access to C.M.'s credit card through his cell phone and he is

13

able to use up to $100 per day. K.G. stated he uses the money for ride-hailing services and food deliveries. After conducting these interviews, the Agency concluded the allegation of sexual exploitation was unfounded but remained concerned the child may be in contact with C.M. or someone may be exploiting the child.

In late February 2025, the Agency saw a post on the social media page featuring the billboard. The billboard presented a quote by K.G., specifying K.G.'s first name and sharing a weblink to the social media page. The Agency confirmed the existence of the billboard at the physical location as seen on the social media post.

Soon after, the Agency requested a restraining order protecting the child from C.M. The Agency alleged C.M. violated the juvenile court's no-contact order, March 2024 orders (including the prohibition of seeking placement of any youths), and section 827 (which prohibits the dissemination of information related to the juvenile case file).

The juvenile court issued a temporary restraining order in late February and an amended order early March 2025. The court ordered C.M. to surrender his firearms and issued a no-contact order. It also ordered C.M. and his agents, including T.D., to: "not provide cell phones to the child"; "comply with juvenile case record confidentiality as required by . . . section 827"; "not disseminate any information about the child and this . . . court case to a third party, except to their own legal counsel"; and "not disseminate any information contained within, or the contents of, this temporary restraining order case to a third party, except to their own legal counsel."

Additionally, the juvenile court found: "[T]he attachments/exhibits to the [restraining order] application contain online, social media, and public postings of material that is privileged[,] confidential

14

and protected from disclosure by . . . section 827. This material includes information about confidential . . . [c]ourt [p]roceedings, images, photos, likenesses, recordings, statements and descriptions of a minor under the supervision of the . . . [c]ourt." The court ordered C.M. "to remove all images, likenesses, photos, recordings, statements or descriptions of the named minor or . . . [c]ourt legal proceedings from any public space, including but not limited to social media and billboards." It ordered C.M. "shall not post or disseminate any privileged or confidential information described in . . . section 827 in any public space, online or otherwise and shall not disclose this information to any third party except to their own legal counsel."

The juvenile court extended the temporary restraining order and continued the order to show cause hearing several times.

In late March 2025, T.D. e-mailed the Agency's deputy director of community and government relations, informing the deputy director that C.M. wanted to adopt the child and K.G.

*B. Hearing*

The order to show cause hearing began in late May 2025. C.M. testified as follows. He hired his publicist T.D. to help him develop a public relations campaign to communicate with the Agency's leadership and the Board regarding the Agency's purported mistakes regarding the child. C.M. said he sought to find "common ground" with the Agency and return to court with a "unified . . . presentation." T.D. recommended placing a billboard near the courthouse. She also created a social media page to "[t]o seek other supporters that have experienced the same issue and gain support for a conversation" with the Agency. The name of the social media page, "Bring [the child and K.G.] home," was merely a "campaign slogan" and the word, "home," did not mean C.M.'s home. The social media page included images of

15

the child without blurring his face. C.M. said the posting of the child's images was a mistake. C.M. testified the campaign was "currently paused."

C.M. denied having contact with the child during the no-contact period, notwithstanding the child's attempts to contact him weekly or biweekly. C.M. denied having a video call with the child. C.M. explained a screenshot of a video call, which purportedly showed him and the child and was featured in a video posted online, was edited. The original image depicted another person talking to the child, and T.D. altered the original as part of the public relations campaign. C.M. was unaware of the edited image until the Agency requested the restraining order.

C.M. testified he still had the child on his family cell phone plan and paid for the child's cell phone line. C.M. denied providing the child with a new cell phone after the child's previous cell phone was removed from the child. C.M. denied giving money to the child for over two years. But he acknowledged the child may have access to his credit card as the child knew the credit card number. C.M. did not consider closing the credit card because he used it as his primary credit card.

T.D. testified as follows. C.M. posted an advertisement "looking for a persuasive letter writer." T.D. responded to the advertisement and proposed calling on elected officials to intervene in the child's case. After her contact with elected officials failed, T.D. decided to produce a video sharing C.M. and the child's story. She collected photographs and videos of the child from C.P. and C.M. T.D. included images of the child in the video posted online, thinking it was appropriate to do so based on information she found online. Shortly after posting the video online and sending the video to the Board, she conducted additional online research, realized she made a mistake

16

by including the child's image, and immediately took down the video. She later made a video that blurred the images of the child and K.G.

T.D. testified she wrote at least two letters to the Board. In one letter, T.D. wrote C.M. was seeking the placement of the child with C.M., but T.D. thought placement was a synonym for adoption.

T.D. testified she altered the image of the child in the video call to portray the child as speaking with C.M. The purpose of the edit was to "humanize [C.M.] and show him to be a loving father and foster father."

T.D. did not perform any actions without C.M.'s knowledge. T.D. said the goal of the campaign was for the child to be in C.M.'s care.

C.P. testified as follows. He had known C.M. for 13 or 14 years. He met the child when the child was placed with C.M. or visiting C.M. C.P. said he used to talk to the child every couple of months but had not spoken to the child in over six months. C.P. testified C.M. did not ask C.P. to request placement of the child.

*C. Ruling*

In June 2025, the juvenile court issued the restraining order. It considered the entire record in the case and found: C.M. "admitted to making financial and electronic resources, including cell phones, available to [the child and K.G.] with no supervisory oversight, no limits, and no supervision of the electronic devices or content available to the minors. [¶] In his efforts to continue a relationship with the minors, [C.M.] has neglected and abandoned any adult responsibilities or restraint. This conduct continued, furthered, and advanced an ongoing continuing relationship with the minors through electronic means and demonstrated a coercive control of the minors. The coercive conduct included funding their lifestyle while in a court-supervised placement, offering the minors the ability and means to contact

17

him to further the campaign and the relationship and interfere with the court's ability to supervise the minors and ensure their safety and welfare; in other words, it conflicted with the court's obligation to protect both the emotional and physical well-being of the minors." The court determined C.M.'s "conduct, including the photos of [C.M.] engaging in a [video] call with [the child and K.G.], the transmittal of photos and audio to . . . [C.M.], the use of third parties to communicate with the minors, is sufficient evidence of contact between [C.M.] and the minors."

The juvenile court rejected "the evidence or the idea that the photo of the [video] call between [C.M.] and [the child] is a fraud." It found the explanation for the edited image was not credible. It also found T.D. and C.M. were not credible "in many respects."

The juvenile court concluded, "[T]he use, sharing and disclosure of the minors' personal identifying information, their status as foster youth, their history with social services violates . . . [s]ection 827." The court also concluded, "This conduct and the contact with the minors . . . violated the [c]ourt's previous [March 2024] protective orders."

The juvenile court ordered C.M. to remove the child from the C.M.'s cell phone plan or the child's access to it and remove the child's access to C.M.'s financial funds. It also prohibited C.M. from sharing information protected by section 827. With respect to the three-year restraining order, the court ordered C.M. to: (1) "possess no firearms, guns, or ammunition" and sell, store with a licensed gun dealer, or turn into law enforcement any prohibited items in his possession within 24 hours[3]; (2) possess no body

---

[3] In late May 2025, the juvenile court found C.M. had surrendered his firearms in compliance with the March 2025 temporary restraining order. But the court clarified it now needed a declaration

armor; (3) not look for the child; (4) "not to abuse . . . harass, strike, threaten, assault, hit, follow, stalk, molest, destroy the personal property of, keep under surveillance, impersonate, or disturb the peace of" the child; (5) "not exercise coercive control of" the child; (6) "not to contact the" child; and (7) stay at least 100 yards away from the child.

C.M. timely appealed.

## DISCUSSION

### I.

SUBSTANTIAL EVIDENCE SUPPORTS THE RESTRAINING ORDER

C.M. argues there was no evidence showing C.M. abused or neglected the child. C.M. argues, "The restraining order is based on speculation." We disagree.

Section 213.5, subdivision (a) authorizes a juvenile court to issue a restraining order in the same manner as a domestic violence protective order. The court may issue, inter alia, orders "enjoining a person from molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, harassing, telephoning, . . . destroying the personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the child." (§ 213.5, subd. (a).) The restraining order may last up to three years. (§ 213.5, subd. (d)(1).)

A juvenile court may issue a restraining order "if it finds that the person to be restrained has '"disturbed the peace"'—that is, engaged in conduct that destroys a person's mental or emotional calm—of the person to be protected." (*In re Lilianna C.* (2024) 99 Cal.App.5th 638, 644.) "This conduct includes . . . coercive control, which is a pattern of behavior that in

attesting to his "continued surrender" or confirming C.M. did not possess any firearms, ammunition, or firearm parts.

19

purpose or effect unreasonably interferes with a person's free will and personal liberty. Examples of coercive control include, but are not limited to, unreasonably engaging in any of the following: [¶] . . . [¶] Controlling, regulating, or monitoring the other party's movements, communications, daily behavior, finances, economic resources, or access to services." (Fam. Code, § 6320, subd. (c)(3).)[4]

"Issuance of a restraining order under section 213.5 does not require 'evidence that the restrained person has previously molested, attacked, struck, sexually assaulted, stalked, or battered the [petitioner or person to be protected].'" (*In re S.G.* (2021) 71 Cal.App.5th 654, 671.) "Because this issue arises in a dependency proceeding, we must keep in mind that the 'purpose of a dependency hearing is to determine the best interests of the child and to protect those interests.'" (*In re A.M.* (2019) 37 Cal.App.5th 614, 619.)

"A restraining order under section 213.5 is reviewed for an abuse of discretion. The juvenile court's factual findings are upheld if they are supported by substantial evidence."[5] (*In re A.M., supra,* 37 Cal.App.5th at p. 619.)

---

[4] The family and juvenile courts "apply the same definitions of abuse when issuing restraining orders." (*Garcia v. Escobar* (2017) 17 Cal.App.5th 267, 271; Cal. Rules of Court, rule 5.630(b).) Under Family Code section 6203, abuse means, inter alia, "[t]o engage in any behavior that has been or could be enjoined pursuant to [Family Code] [s]ection 6320." Family Code section 6320 specifies coercive control.

[5] As C.M. does not challenge whether the juvenile court abused its discretion, we consider solely whether substantial evidence supports the juvenile court's factual findings.

Substantial evidence supports the juvenile court's finding that C.M. disturbed the peace of the child. C.M. testified he continued to pay for the child's cell phone line, providing no supervisory oversight, even though the child was not in C.M.'s care and in the court-supervised placement. Evidence in the record supports a reasonable inference that C.M. also allowed the child to access C.M.'s funds, which were tied to his credit card account, despite the child living in the court-supervised placement. By giving the child access to C.M.'s credit card, C.M. enabled the child to order ride-hailing services through his cell phone and leave the court-supervised placement without permission on a frequent basis. The child's unauthorized departures to unknown locations put the child's safety at risk. C.M. also enabled the child to purchase food deliveries at the court-supervised placement, an action that, according to the court-supervised placement, put the child and other youths in danger. By facilitating the child's access to financial and electronic resources, C.M. was able to further his relationship with the child and communicate with the child to advance his public relations campaign. C.M.'s influence interfered with safeguarding the child's emotional and physical well-being.

Moreover, acts that violate a protective order constitute additional acts of abuse. (See *In re A.P.* (2024) 103 Cal.App.5th 1137, 1144 ["engaging in behavior that violates a [temporary restraining order] constitutes an additional act of abuse"].) Here, substantial evidence shows C.M. contacted the child in violation of the March 2024 no-contact order. A screenshot of a video call appears to show C.M. and the child in violation of the no-contact order. The juvenile court rejected C.M.'s and T.D.'s explanations that the image in the video was edited, and "we defer to the . . . court's credibility findings" on appeal. (*In re C.L.* (2025) 116 Cal.App.5th

21

53, 67.) The production of the online videos, which included images of the child at the court-supervised placement during the no-contact period, suggests contact between the child and C.M., T.D., his agents, or another third party at C.M.'s request.

## II.

### C.M.'s As-applied Constitutional Challenges Are Forfeited

For the first time on appeal, C.M. argues the restraining order, which required him to surrender his firearms, is overbroad and violated his right to keep and bear arms under the Second Amendment to the United States Constitution. He contends his possession of guns is irrelevant to his alleged misconduct involving the child. He asserts no legitimate reason justifies the denial of his Second Amendment right.

An as-applied constitutional challenge to a firearms restriction is forfeited unless objected to or raised in the trial court. (*Zachary H. v. Teri A.* (2023) 96 Cal.App.5th 1136, 1143.) "Because an as-applied challenge asserts a 'constitutional defect [that] may be correctable only by examining factual findings in the record or remanding to the trial court for further findings' [citation], it is not appropriately raised for the first time on appeal." (*Id.* at p. 1144.) But the forfeiture rule does not apply to facial constitutional challenges posing pure questions of law. (*In re D.L.* (2023) 93 Cal.App.5th 144, 156.)

We construe C.M.'s overbreadth and Second Amendment arguments to be as-applied challenges, given C.M.'s arguments focus solely on his individual circumstances. As C.M. failed to object or raise the as-applied constitutional challenges below in the trial court, we deem these claims forfeited.

## DISPOSITION

The order is affirmed.

MOTOIKE, ACTING P. J.

WE CONCUR:

SANCHEZ, J.

DELANEY, J.